# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

JANE DOE,

      Plaintiff,

      v.

THE JOHNS HOPKINS HEALTH SYSTEM
CORPORATION and
SUBURBAN HOSPITAL, INC.,

      Defendants.

Civil Action No. TDC-16-1635

## MEMORANDUM OPINION

Plaintiff Jane Doe, a licensed psychologist, was recruited by Defendant Suburban Hospital, Inc. ("Suburban") to address a number of possible ethical and regulatory issues at Suburban and improve compliance with internal policies and applicable law. She now alleges that after she reported numerous possible violations and conflicts of interest, Suburban fired her and spread damaging rumors about her fitness to practice psychology. Doe has brought this civil action against Suburban and its parent corporation, the John Hopkins Health System Corporation ("JHHS"), alleging retaliation under the False Claims Act, 31 U.S.C. §§ 3729 to 3733 (2012), retaliation under the Maryland Healthcare Worker Whistleblower Protection Act ("MHWWPA"), Md. Code Ann., Health Occ. §§ 1-501 to 1-506 (West 2008), post-termination retaliation under the MHWWPA, defamation, and intentional interference with business relations. Pending before the Court is Defendants' Motion to Dismiss Portions of Plaintiff's First Amended Complaint. A hearing on the Motion was held on March 23, 2017. For the reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following facts are presented in the light most favorable to Doe, the non-moving party. Doe, a resident of the District of Columbia, is a licensed psychologist with a doctoral degree in education. Suburban is a Maryland corporation that owns and operates a hospital in Bethesda, Maryland. JHHS is a Maryland non-stock corporation based in Baltimore, Maryland and is the sole owner of Suburban.

Doe owned a solo psychology practice for over 25 years. In the summer of 2013, Harry Gill, the Medical Director of Suburban's Behavioral Health Department, and Donald Silver, Suburban's Corporate Director, recruited Doe to serve as the new Director of Suburban's Outpatient Mental Health Department ("OMHD"). Suburban's accreditation for the OMHD had lapsed and its former Director had recently resigned in the wake of significant ethical and compliance violations, including the practices of completing patient notes before actually meeting with patients and allowing unlicensed therapists to provide treatment. Silver and Gill pledged that if Doe joined the team at Suburban, they would support her in rectifying the ethical and regulatory failures. Doe accepted their offer and began work at Suburban in November 2013, curtailing her private practice in order to accommodate her new responsibilities.

Shortly after starting at Suburban, Doe identified various ethical and regulatory violations that could cause Suburban to lose its accreditation. After reporting each violation internally, Doe took action to correct each issue. Despite the earlier promises of support, many of her efforts were met with resistance. In particular, Doe identified various problems with the billing practices of Axis Healthcare Group, a private psychiatry services company controlled by Gill that contracts with Suburban to provide psychiatric services. These problems included double-billing to the Centers for Medicare & Medicaid Services ("CMS"); inflating bills payable by

CMS, private insurers, and patients; falsely certifying compliance with CMS regulations; and providing and billing for unnecessary services. Doe also discovered that Gill and other Axis employees were self-referring Suburban patients throughout the Axis network, which she believed to be a violation of state and federal law. Doe reported her concerns to a number of Suburban officials, including Gill, Silver, and Jacqueline Schultz, Senior Vice President of Clinical Operations and Doe's direct supervisor. Suburban nevertheless took no corrective action. Schultz was initially supportive of Doe's concerns, but she later cautioned Doe not to use the word "fraud" in her presence, because Schultz would then be required to report the matter herself.

Doe also learned about, and reported to management, other potential conflicts of interests that caused her concern, including a 2013 proposal by Gill for a Partial Hospitalization Program run under his own umbrella corporation and a 2015 proposal for Suburban to engage a company with which Gill had an undisclosed relationship to provide telephonic outpatient support for mental health patients. In 2014, Doe recommended to Silver that an art therapist be terminated for permitting an unsupervised intern to run Suburban's art therapy program, but management resolved the matter with a written warning. Later that year, when Doe recommended that the same art therapist be terminated for operating the art therapy program without the required license, Suburban again chose to resolve the matter with a written warning. Doe also reported that Silver, who had no medical training, had recommended treatment for patients, only to be told that the practice had been going on for years. No corrective action was taken. Silver, who was popular among Suburban's employees, left Suburban in 2015 without explanation, and some employees blamed Doe for causing his departure.

3

On August 17, 2015, Doe was terminated from her position. At a meeting that day with Doe and Schultz, Wayne Stockbridge, the Senior Director of Human Resources, informed Doe that she was being terminated immediately due to a reorganization of her department. JHHS policy requires that an employee affected by reorganization be consulted before termination and provided six weeks' notice. Stockbridge asked Doe to sign a severance agreement that was modified to add provisions releasing claims of whistleblower retaliation and stating that Doe was unaware of wrongdoing at Suburban or JHHS and had not reported any compliance matters. During the meeting, Stockbridge also stated that he had been told that Doe:

a. Created an unpleasant work environment by sharing an office with her staff;
b. Created a disruptive work environment by having employees share an office;
c. Promoted an environment of paranoia by talking quietly or having conversations in the hallway instead of in the shared office;
d. Invited some, but not all[,] of her staff to a glass-blowing class as a teambuilding exercise;
e. "Gossiped" about staff and made sarcastic "quips" about staff;
f. Sent text messages to staff after hours and on weekends;
g. Intimidated her staff by setting up meetings that were "confidential";
h. "Trapped" Mr. Silver into giving clinical advice;
i. Held a "personal vendetta" against [an Axis employee], as evidenced by her asking . . . whether [that employee] had committed wrongdoing; and
j. Wore short skirts, sheer pantyhose, open blouses, and no underwear.

Am. Compl. ¶ 34, ECF No. 11. Stockbridge told Doe that the allegations were unrelated to her termination, but that he thought that she should be aware of them. Doe believed that the statements were intended to convey a threat that Suburban would spread the allegations more widely if Doe fought the termination or reported further concerns about fraud. In a telephone conversation two days later, Stockbridge informed Doe that her termination was based in part on this list of allegations after all. He acknowledged that he had not personally investigated the allegations and noted that the allegation related to the glass-blowing class was likely false.

4

On or about September 9, 2015, Doe, through counsel, informed JHHS that she would not sign the severance agreement. According to Doe, Suburban and JHHS then began to spread rumors about Doe in an attempt to discredit her in her professional community. Katherine Brunkow, an employee at the Washington Center for Psychoanalysis ("the WCP"), informed Doe that someone at Suburban, whom she declined to identify, had called her and made disturbing allegations about Doe, including that Doe had been escorted out of Suburban by hospital security, that she had "lost it," and that she had pulled her skirt up over her head. Am. Compl. ¶ 38. None of the allegations were true. Brunkow later told Doe that a second source had given her additional negative information about Doe. Doe has been a member of, and held leadership positions in, the WCP, a professional organization that served as a source of patient referrals while she was in private practice. As a result of the allegations made about Doe to Brunkow, WCP leadership became concerned about Doe's fitness to practice and forced her to undergo a review by the Colleague and Patient Assistance Committee ("CPAC"). Despite Doe's denial of the allegations, CPAC suggested that Doe needed drug or alcohol treatment.

Around the same time, Nina Van Sant, a Suburban employee who had previously worked under Doe's supervision, contacted the Washington School of Psychiatry ("the WSP"), where Doe held a teaching position. Van Sant told the WSP that if Doe continued to teach there, she was going to withdraw from the program, and she made other negative comments to a member of the WSP steering committee. As a result of Van Sant's comments, the WSP terminated Doe's teaching position. Doe believes that the WSP steering committee member was the second person who gave negative information to Brunkow. Since then, Doe has been ostracized from her personal and professional networks, has struggled to rebuild her private practice without referrals from the WCP and the WSP, and has suffered humiliation and mental stress.

**DISCUSSION**

The Motion seeks dismissal of Doe's claims of post-termination retaliation under the MHWWPA (Count III), defamation (Count IV), and intentional interference with business relations (Count V).  Defendants argue that the MHWWPA claim based on post-termination conduct must be dismissed because that statute does not cover post-termination employer conduct.  Defendants further assert that Doe has failed to state a claim for defamation because the communications she has identified as defamatory either are not actionable as a matter of law or are insufficiently pled.  Finally, they contend that in the absence of a viable defamation claim, the intentional interference claim necessarily fails because it must be supported by an independent wrongful act.

## I.      Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Legal conclusions or conclusory statements do not suffice.  *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff.  *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.     Maryland Healthcare Worker Whistleblower Protection Act

Count III alleges that Defendants violated the MHWWPA by retaliating against Doe for disclosing ethical and regulatory violations at Suburban through a post-termination campaign to discredit her within her professional community.  These activities included disseminating false

6

statements to the WCP and the WSP, which led to an inquiry into Doe's professional fitness and her termination from a teaching position.

The MHWWPA provides that:

[A]n employer may not take or refuse to take any personnel action as reprisal against an employee because the employee:

(1) Discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation;
(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by the employer; or
(3) Objects to or refuses to participate in any activity, policy, or practice in violation of a law, rule, or regulation.

Md. Code Ann., Health Occ. § 1-502. "Employee" is defined as "any individual licensed or certified by a board under this article who performs services for and under the control and direction of an employer for wages or other remuneration." *Id.* § 1-501(c)(1). "Personnel action" is not defined.

According to Defendants, this count should be dismissed because the MHWWPA covers only retaliatory "personnel action" that occurs while the employee is actually employed by the employer. They claim that "personnel action" within the meaning of section 1-502 requires the existence of an employment relationship and does not encompass the negative references and blacklisting activities alleged here. The Court of Appeals of Maryland has not addressed whether the MHWWPA protects only current employees or the scope of the term "personnel action." *See Lark v. Montgomery Hospice, Inc.*, 994 A.2d 968, 977 (Md. 2010) (holding that the MHWWPA does not extend to "former employees who made no internal reports" before termination, without addressing whether former employees are generally protected by the Act).

The Court of Appeals has set forth guidance on the appropriate means to interpret Maryland statutes. "To ascertain the intent of the General Assembly, we begin with the normal,

7

plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends." *Lark*, 994 A.2d at 975 (quoting *Lockshin v. Semsker*, 987 A.2d 18, 28-29 (Md. 2010)). However, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* "Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia." *Id.* Although "remedial statutes are to be construed liberally in favor of claimants 'to suppress the evil and advance the remedy,'" *Lark*, 994 A.2d at 976 (quoting *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 750-51 (Md. 2007)), "in every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense," *Lark*, 994 A.2d at 976 (quoting *Lockshin*, 987 A.2d at 29).

Applying these principles, the Court concludes that the MHWWPA's bar on the taking of a "personnel action" as a reprisal for reporting does not encompass the post-termination communications with the WCP and the WSP aimed at discrediting Doe. Although "personnel action" is not defined in the relevant statute, Maryland regulations relating to the rights of state employees define "personnel action" as "an appointment, promotion, disciplinary or corrective action, acting capacity, reassignment, reclassification, reinstatement, performance appraisal, decision affecting compensation, benefits, training, or any other matter which significantly affects an individual's compensation, terms, conditions, or privileges of employment." Md. Code Regs. 17.04.08.02 (2017). In other contexts, courts have construed the term "personnel

action" to consist of "dismissal or any other action, including demotion or transfer, that is the functional equivalent of dismissal," *Stott v. Haworth*, 916 F.2d 134, 137 n.3 (4th Cir. 1990) (applying North Carolina law), or "transfer, lay-off, dismissal and other personnel action," *Smith v. Montgomery County*, 195 A.2d 593, 595 (Md. 1963) (quoting a Montgomery County, Maryland regulation).

Although these definitions are by no means determinative, they illustrate that the ordinary meaning of "personnel action" would encompass formal or informal actions effecting a change in an employee's status at work, such as a hiring, termination, promotion, demotion, transfer, or reassignment. "Personnel action" could be read to include changes in the terms and conditions of employment, such as a change in salary, benefits, duties, or working hours; official recognition such as an award, bonus, or letter of commendation; or adverse actions to penalize an employee, such as a suspension or reprimand. But to interpret the term to include the action alleged here—unsolicited, post-termination comments made to professional organizations in the plaintiff's field—would be to stretch the plain meaning of "personnel action" beyond its breaking point. *Cf. Bechtel v. St. Joseph Med. Ctr., Inc.*, No. MJG-10-3381, 2012 WL 1476079, at *9 (holding that the False Claims Act provision barring retaliatory acts "in the terms and conditions of employment" was "not reasonably interpreted to include post-termination retaliatory actions").

The Court recognizes that this interpretation arguably runs contrary to the statute's "apparent purpose." *See Lark*, 994 A.2d at 975. The MHWWPA seeks to protect whistleblowers from retaliation for reporting misconduct in the healthcare sector, yet failing to provide legal protection against post-termination dissemination of negative information aimed at undermining a former employee's professional opportunities leaves whistleblowers vulnerable

9

and could deter them from coming forward.  As the Supreme Court has acknowledged in a related context, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  Nevertheless, the legislative decision to prohibit some, but not all, forms of potential retaliation is not necessarily inconsistent with the statute's remedial purpose.  Where the legislature has chosen clear language that bars only retaliation in the form of a "personnel action," construing this term to encompass Defendants' communications to the WCP and the WSP would be an impermissibly "forced" interpretation that is "incompatible with common sense."  *Lark*, 994 A.2d at 975-76 (quoting *Lockshin*, 987 A.2d at 29).

This conclusion is bolstered by the fact that the Maryland legislature has demonstrated its willingness and ability to use broader language to prohibit retaliation against employees for reporting misconduct in other circumstances, but did not do so here.  Under the anti-retaliation provision of the Maryland employment discrimination statute, "An employer may not discriminate or retaliate against any of its employees . . . because the individual has opposed" employment discrimination practices or "made a charge" or otherwise "participated" in an employment discrimination complaint.  Md. Code Ann., State Gov't § 20-606(f) (2015).  By barring any conduct that would "discriminate or retaliate" against an employee who has opposed employment discrimination, the statute bars a range of retaliatory activity that includes, but extends well beyond, personnel actions.  Where the legislature has elsewhere used broader language to describe the range of prohibited retaliatory activity, its decision to bar only retaliatory "personnel actions" under the MHWWPA must be viewed as placing a deliberate limit on the types of activities barred by this statute.  Notably, the United States Supreme Court

drew a similar distinction within Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (2012), when it concluded that the "discriminate against" language describing the bar on retaliation, *see id.* § 2000e-3(a), covered a broader range of conduct than the narrower language describing the range of conduct constituting employment discrimination, which consists of acts that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," *id.* § 2000e-2(a). *Burlington Northern*, 548 U.S. at 62.

The case law cited by Doe does not alter this conclusion. In *Robinson v. Shell Oil Company*, 519 U.S. 337 (1997), the Supreme Court held that the retaliation provision of Title VII applies to actions taken against current and former employees and reversed the dismissal of a complaint alleging that a former employee who had filed an EEOC complaint had been subjected to unlawful retaliation in the form of negative references to prospective employers. *Robinson*, 519 U.S. at 339, 346. The Court relied heavily on the absence of a provision restricting the term "employee," defined as "any individual employed by an employer," 42 U.S.C. § 2000e(f), to *current* employees, and the fact that the statute provides a remedy of reinstatement to "employees," which would be applicable only to former employees. *Robinson*, 519 U.S. at 342. Yet even if this Court were to conclude, based on the same absence of a temporal restriction and the presence of a remedy of reinstatement under the MHWWPA, that the term "employees" under the MHWWPA includes former employees, Title VII differs significantly in that its anti-retaliation provision broadly states that an employer may not "discriminate against any of his employees" for having "opposed" employment discrimination. 42 U.S.C. § 2000e-3(a). As discussed above, this prohibition on retaliatory "discriminat[ion]" is significantly broader than the bar on retaliatory "personnel action" under the MHWWPA.

The remaining case law cited by Doe is unpersuasive because it directly relies on *Robinson*. In *Kissinger-Campbell v. Harrell*, No. 8:08-cv-568-T-27TBM, 2009 WL 103274 (M.D. Fla. Jan. 14, 2009), the court concluded, based on *Robinson*, that the Florida Whistleblower Act ("FWA") prohibiting "retaliatory personnel action" against "employees" extended to former employees. *Id.* at *6-7 (citing Fla. Stat. Ann. §§ 448.101, 448.102 (2013)). The court's analysis, however, did not specifically address the meaning of the term "personnel action" or whether it included the conduct at issue there—calling the plaintiff's prospective employers and damaging her future job prospects. *Id.* at *7. Likewise, the *dicta in Rangarajan v. Johns Hopkins Health Sys. Corp.*, No. WMN-12-1953, 2014 WL 6666308 (D. Md. Nov. 21, 2014), stating that "persuasive authority indicates that post-termination retaliatory action may fall within the scope of 'personnel action' protected by" the MHWWPA, relied directly on *Robinson* and *Kissinger-Campbell*. *Id.* at *3 n.1.

Thus, the Court concludes that, based on the plain language of the statute, Defendants' post-termination communications with the WCP and the WSP do not fall within the bar on retaliatory personnel actions under the MHWWPA. The Motion is thus granted as to Count III. The Court therefore need not and does not address whether the MHWWPA protects only current employees or extends its reach to former employees as well.

### III.    Defamation

Under Maryland law, to establish a *prima facie* case of defamation, a plaintiff must establish that (1) the defendant made a defamatory statement to a third person (a requirement known as publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm. *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001). Under the first element, a defamatory statement is one "which tends to

expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Id.* (quoting *Rosenberg v. Helinski*, 616 A.2d 866, 871 (Md. 1992)). A statement that is defamatory *per se* is one for which the "words themselves impute the defamatory character," such that the plaintiff need not plead additional facts demonstrating their defamatory nature. *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979). A statement that is defamatory *per quod* is one for which extrinsic facts are necessary to demonstrate "the defamatory character of the words sued upon." *Id.*

Under the second element, a statement is "false" if it was "not substantially correct." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012). Establishing the third element, that a defendant is legally at fault, requires a showing that, at a minimum, the party making the false statement acted negligently. *Hearst Corp. v. Hughes*, 466 A.2d 486, 490-92 (Md. 1983). For the fourth element, actual harm must generally be established, but in cases in which the statement was defamatory *per se* and was made with actual malice, harm may be presumed. *Id.* at 493; *Shapiro v. Massengill*, 661 A.2d 202, 217-18 (Md. Ct. Spec. App. 1995).

Although Doe asks the Court to consider her defamation claim as a single cause of action based on a broad, intentional campaign including statements made at her termination meeting and others made to the WCP and the WSP, each alleged defamatory statement constitutes a "separate instance of defamation" that must be specifically alleged. *English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d 862, 1999 WL 89125, at *3 (4th Cir. 1999) (unpublished decision). *See also Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 758 (D. Md. 2015) ("To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement."); *Gainsburg v. Steben & Co., Inc.*, 838 F. Supp. 2d 339, 344 (D. Md. 2011) (stating that a plaintiff

cannot simply allege "a pattern of false statements made for the purpose of bringing [the plaintiff] into disrepute"). Thus, the Court considers each alleged defamatory statement in turn. As set forth below, the Court finds that Doe has properly pleaded false, defamatory statements by Stockbridge and to Brunkow of the WCP.

### A.   Stockbridge Statements

Doe first alleges that Stockbridge, Suburban's Senior Director of Human Resources, defamed her at the meeting at which she was terminated when he made false statements about her in the presence of Schultz, Doe's direct supervisor.  In particular, the statement that Doe "[w]ore short skirts, sheer pantyhose, open blouses, and no underwear," Am. Compl. ¶ 34, was plainly of a nature that would cause public scorn or ridicule.  Doe alleges that this statement was published to Schultz, that it was false, and that Stockbridge knew that it was false.  The statement was defamatory *per se* because "the words themselves impute the defamatory character." *See Metromedia*, 400 A.2d at 1123.  Doe has alleged that she suffered both reputational harm and emotional distress as a result of these statements.

Defendants argue that Doe has not stated a claim for defamation because (1) the statement was not published to a third party; and (2) the employer-employee qualified privilege applies.  Relying on *Gray v. AT&T Corp.*, 357 F.3d 763 (8th Cir. 2004), Defendants argue that Stockbridge's statement in the presence of Schultz does not constitute defamation because intra-company communications in the regular course of business between employees of the same corporation are not publications. *Id.* at 766 (applying Missouri law).  Maryland, however, has never adopted such a rule.  Rather, Maryland cases involving claims of defamation in the workplace have either directly referred to statements between employees of a company as publications, or have presupposed defamatory statements' publication in deciding whether the

14

statements were protected by privilege. *See, e.g., Marchesi v. Franchino*, 387 A.2d 1129, 1131 (Md. 1978) (holding that defamatory statements by an employee to a manager about another employee could be protected by conditional privilege); *Gen. Motors Corp. v. Piskor*, 352 A.2d 810, 814 n.2 (Md. 1976) (stating that the jury was "properly permitted to conclude" that the defendant's employees defamed the plaintiff to his fellow employees); *Henthorn v. W. Md. Ry. Co.*, 174 A.2d 175, 180 (Md. 1961) (describing the "publication" of defamatory statements about the plaintiff during an internal hearing before a trainmaster); *see also Shapiro*, 661 A.2d at 218-19 (concluding that an employer's oral statements to the plaintiff's co-workers concerning the reasons for the plaintiff's termination were defamatory *per se*, but considering whether they were protected by the qualified privilege); *Happy 40, Inc. v. Miller*, 491 A.2d 1210, 1214 (Md. Ct. Spec. App. 1984) (stating that the plaintiff's manager "published" defamatory statements about the plaintiff to her fellow employees); *Rabinowitz v. Oates*, 955 F. Supp. 485, 488-89 (D. Md. 1996). Thus, under Maryland law, an intra-company communication may constitute a publication.

Defendants, however, correctly assert that Maryland law recognizes a qualified privilege for communications arising out of the employer-employee relationship in defamation cases. *Gohari*, 767 A.2d at 328; *see also, e.g., McDermott v. Hughley*, 561 A.2d 1038, 1046 (Md. 1989). This privilege arises from the common law principle that a defendant "may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest." *Marchesi*, 387 A.2d at 1131 (citations omitted). For example, "[a] defamatory statement dealing with reasons for an employee's discharge may be privileged if communicated to fellow-employees or to a recipient . . . 'who justifiably is entitled to receive it.'" *Leese v.*

15

*Baltimore Cty.*, 497 A.2d 159, 176 (Md. Ct. Spec. App. 1985) (quoting *Happy 40, Inc.*, 491 A.2d at 1214), *abrogated on other grounds by Harford Cty. v. Town of Bel Air*, 704 A.2d 421 (Md. 1985). The privilege can be lost, however, if the defendant made the allegedly defamatory statement with malice, defined as "actual knowledge that his or her statement is false, coupled with his or her intent to deceive another by means of that statement." *Seley-Radtke v. Hosmane*, 149 A.3d 573, 576 (Md. 2016) (quoting *Piscatelli*, 35 A.3d at 1147).

Although the qualified privilege may be applicable to the Stockbridge statements, it is premature to dismiss the defamation claim on this basis. The qualified privilege is an affirmative defense, *Shapiro*, 661 A.2d at 219 n.11, and a motion to dismiss under Rule 12(b)(6) "does not generally invite an analysis of potential defenses to the claims asserted in the complaint." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 185 (4th Cir. 2000). A court may consider defenses on a motion to dismiss only when "the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Id.* "The granting of a motion to dismiss on the basis of an asserted conditional privilege . . . is not appropriate where the complaint alleges facts that would support an abuse of that privilege." *Woodruff v. Trepel*, 725 A.2d 612, 623 (Md. Ct. Spec. App. 1999).

The Court is not satisfied that the Amended Complaint clearly reveals the validity of the conditional privilege because the privilege "may be lost if abused," *Leese*, 497 A.2d at 176, and the Amended Complaint alleges facts that, viewed in the light most favorable to Doe, support an inference of abuse. Abuse of the privilege occurs if the statement was not made "in furtherance of the interest for which the privilege exists," or was communicated to a third person other than someone "whose hearing is reasonably believed to be necessary or useful to the protection of the interest." *Id.* Abuse also occurs if the statement was made with "malice" in that it was made

16

with "actual knowledge" that the "statement is false" and with the "intent to deceive another by means of the statement." *Piscatelli*, 35 A.3d at 1148.

According to the Amended Complaint, Stockbridge told Doe that the allegations "had nothing to do with the termination, but that he thought she should be aware of them." Am. Compl. ¶ 34. Only later, according to Doe, did Stockbridge revise his story and claim that the offensive and embarrassing accusations were part of Defendants' rationale for firing her. Thus, it is not clear whether the statement was made in furtherance of the "applicable societal interest" underlying the qualified privilege. *See Woodruff*, 725 A.2d at 622. Moreover, Doe effectively alleged malice by asserting that Stockbridge acknowledged that some of the statements were not true and that she understood the statements to convey a threat that if Doe fought the termination or exposed fraud at Suburban, the false allegations would be disseminated further. Whether Stockbridge acted with malice, which would render the qualified privilege inapplicable, is a question of fact not properly resolved on a motion to dismiss. *Piscatelli*, 35 F.3d at 1148; *Leese*, 497 A.2d at 177 ("While the existence of a privilege is an issue of law, its forfeiture by abuse is an issue of fact."); *Woodruff*, 725 A.2d at 623 (denying a motion to dismiss raising the defense of a qualified privilege where the complaint alleged facts supporting actual malice). The Court therefore finds that Doe has alleged a plausible defamation claim arising from Stockbridge's statements.

### B.    Brunkow Statements

Defendants also assert that Doe has failed to state a claim for defamation arising from statements made to Katherine Brunkow of the WCP. The Amended Complaint alleges that shortly after Doe's attorney notified Defendants that Doe would not sign the proposed severance agreement, a Suburban employee contacted Brunkow and told her that Doe "was escorted out of

Suburban Hospital by security, that she 'lost it,' and that she pulled her skirt up over her head." Am. Compl. ¶ 38. Doe contends that these statements were defamatory because they negatively affected her standing in her professional community, as reflected by the WCP's immediate ordering of a CPAC review to assess her fitness to practice psychology. Doe also alleges that the statement was false and that it was intended to harm her reputation in the community. Doe has specifically alleged that she has lost business opportunities from the loss of professional referrals as a result of these statements.

Defendants argue that this defamation claim fails to meet the pleading requirements of Federal Rule of Civil Procedure 8(a) because Doe has not identified which Suburban employee made the statement to Brunkow or alleged that the unidentified person had the authority to make such statements or did so within the scope of employment. They assert that without such information, there is insufficient detail to permit them to respond meaningfully. The Court disagrees. The Amended Complaint alleges to whom the statement was published, approximately when the statement was made, the content of the statement, and that an employee of Suburban published it. Considered as a whole, the Amended Complaint supports the inference that this employee was acting on behalf of Suburban as part of an effort to discredit Doe in retaliation for her failure to agree to the terms of the severance agreement. Although Doe does not presently have knowledge of the Suburban employee's identity, such information can obtained by all parties through a deposition of Brunkow. Thus, the defamation claim should not be dismissed.

*Southern Volkswagen, Inc. v. Centrix Financial, LLC*, 357 F. Supp. 2d 837 (D. Md. 2005), relied upon by Defendants, does not alter this conclusion. In *Southern Volkswagen*, the allegations of defamation were so vague and inconsistent that the court could not even determine

whether the harm alleged met the $75,000 threshold to establish diversity jurisdiction. *Id.* at 844. Although the court thus provided guidance to the plaintiff on what more specific, detailed information to include in an amended complaint, that guidance is not fairly read to establish a heightened pleading standard for defamation claims or minimum pleading requirements in order to state a claim for defamation. *See id.* at 844-45; *Ruyter v. Md. CVS Pharm., LLC*, No. TDC-14-2541, 2015 WL 759425, at *6 (D. Md. Feb. 20, 2015). The Motion is denied as to the statement to Brunkow that Doe "was escorted out of Suburban Hospital by security, that she 'lost it,' and that she pulled her skirt up over her head." Am. Compl. ¶ 38.

However, the allegation that Brunkow received "negative information from a second source, whom she described as a 'senior person, who had heard from younger people,'" *id.*, is insufficient to state an additional claim of defamation. Not only is there insufficient information about the content of the communication by which to assess whether it could constitute a defamatory statement, but Doe's speculation that the speaker might have been Sharon Alperovitz, the Acting Chair of the WSP Steering Committee, reveals that the Amended Complaint does not provide sufficient basis to indicate that the speaker was a Suburban employee. Thus, to the extent that Doe seeks to assert a defamation claim on the basis of this "negative information," the Motion is granted. Such a claim is dismissed without prejudice because the Court is cognizant that discovery could unearth additional facts that would permit Doe to amend her complaint to state a claim relating to this incident.

### C.     Van Sant Statements

Doe further alleges that the statements by Nina Van Sant, a Suburban employee, to the WSP constituted defamation. According to the Amended Complaint, Van Sant stated that if Doe continued to teach a particular class at the WSP, Van Sant would withdraw from the class. Van

Sant also allegedly made negative comments about Doe to either Alperovitz or another member of the WSP steering committee. These statements led to the WSP's decision to terminate Doe's teaching position.

Defendants argue that Van Sant's statements expressed a personal opinion that is not actionable, that it has not been established that Van Sant was acting in her capacity as a Suburban employee when she spoke, and that the allegation of "negative comments" is not enough to state a claim for defamation. The allegation that Van Sant threatened to withdraw from WSP's educational program if Doe continued to teach a class does not constitute a defamatory statement because it cannot reasonably be interpreted as stating "actual facts" about an individual that are "provably false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998). As with the unspecified comments to Brunkow, the claim that Van Sant provided "negative information" to the WSP is insufficiently specific to support a defamation claim. Thus, the Motion is granted to as to the defamation claim based on statements by Van Sant. This aspect of the defamation claim is dismissed without prejudice to a later motion to amend based on additional facts that may be uncovered during discovery on the intentional inference with business relations claim.

## IV.   Intentional Interference with Business Relations

Defendants also assert that Doe has failed to state a claim for the common law tort of intentional interference with business relations, also known as wrongful interference with contractual or business relations. The elements of this cause of action are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and resulting loss.

20

*Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003). The Court of Appeals of Maryland has stated:

> [T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation.

*Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984). Where, as here, no contract is involved, a "broader right to interfere with economic relations exists." *Id.* Because this tort requires more than mere competition, a claim for intentional interference with business relations must include "conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994). Such wrongful or unlawful acts include "common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Id.* (quoting *K & K Mgmt. v. Lee*, 557 A.2d 965, 979 (Md. 1989)). "In addition, 'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference," and where the malice was not "incidental" to the "pursuit of legitimate commercial goals." *Alexander*, 650 A.2d at 271.

According to Defendants, the intentional interference with business relations claim rises or falls with Doe's defamation claim, and Doe has failed to state a plausible claim for defamation. This argument fails because this Court has found that Doe has stated a plausible defamation claim. *See supra* part III. Moreover, the Court finds that Doe has stated a claim for intentional interference with business relations arising from the alleged negative statements to

21

the WCP and the WSP, regardless of whether those statements are specific enough to support a claim for defamation. Doe has asserted that false statements were made both to Brunkow at the WCP and by Van Sant to officials at the WSP that depicted her in such a negative light that the WCP required her to undergo a review by CPAC to assess her fitness to practice psychology, and the WSP terminated her teaching position. There was no business reason for Suburban employees to make derogatory statements about Doe to the WCP and the WSP. By alleging that the statements were known to be false, were made "without justifiable cause," and were "calculated to interfere and cause damage," Am. Compl. ¶ 68, Doe has effectively alleged that that these activities included "injurious falsehoods" that were wrongful and asserted with malice. Such a claim is plausible in the context of the allegations that Doe was terminated by Suburban because she reported regulatory and ethical violations, that after she refused to disavow such allegations she was subjected to allegedly defamatory statements, and that the statements to the WCP and the WSP resulted in significant negative professional consequences. The Court finds therefore that the allegations support a reasonable inference that those negative statements were attributable to Suburban and were made with malice and the intention to interfere with Doe's professional livelihood and ability to rebuild her career. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (stating that when ruling on a motion to dismiss under Rule 12(b)(b), "all reasonable inferences must be drawn in favor of the complainant" (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009))). The Court therefore denies the Motion as to the claim of intentional interference with business relations.

22

**CONCLUSION**

For the foregoing reasons, the Motion to Dismiss Portions of the Plaintiff's First Amended Complaint is GRANTED IN PART and DENIED IN PART.  The Motion is granted as to Count III, which is dismissed with prejudice, and Doe's defamation claims relating to the unspecified statements to the WCP and all statements to the WSP, which are dismissed without prejudice.  The Motion is denied as to all other claims.  A separate Order shall issue.


Date: April 6, 2017

THEODORE D. CHUANG
United States District Judge